**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| **JEREMIAH W. OVERMAN,** | ) | **CASE NO. 7:17CV00165** |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **DR. WANG, DR. AMMONETTE,** | ) | **By:  Robert S. Ballou** |
| | ) | **United States Magistrate Judge** |
| **Defendants.** | ) | |

Jeremiah W. Overman, a Virginia inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983.  In his amended complaint, he alleges that the defendants, Drs. Laurence Wang and Mark Ammonette, provided inadequate medical care for (a) his knee injury and (b) his urinary problems. [1]  After review of the parties' submissions, I conclude that Overman's motion for preliminary injunctive relief must be denied, that the defendants' dispositive motions must be denied as to claim as to his knee injury. [2]  I grant Dr. Wang's motion as to the claimed urinary problems, however, and summarily dismiss that claim as to Dr. Ammonette.

**I.**

**A.  Knee Issues**

In April 2015, Overman's right knee "popped" while he was playing basketball at Green Rock Correctional Center ("Green Rock").  Resp. Mot. Dism. 3, ECF No. 40.  He sought

---

[1]  Overman has a pending motion for leave to amend to add Dr. Ammonette as a defendant to claim (b), and I will grant that motion (ECF No. 60).

[2]  This case is before me by consent under 28 U.S.C. § 636(c).

medical care and was provided with an ACE bandage.[3]  On August 25, 2015, Overman saw Dr.

Wang about his "knee popping again," and requested an "MRI" of his knee.[4]  Id.  Dr. Wang

refused to schedule an MRI.

Dr. Wang saw Overman again on December 10, 2015, for complaints of "popping" and

pain in his right knee.  Id.  Overman reported that he had injured the knee while playing

basketball.  He requested an MRI and a knee brace.  Dr. Wang's examination of the knee was

normal with no positive neurological findings or visible swelling.  Overman had a normal gait.

The doctor prescribed a knee sleeve.

Dr. Wang next saw Overman for complaints about his knee on February 23, 2016.

Overman reported that his knee had "popp[ed]" again while playing basketball.[5]  Again,

Overman requested an MRI.  The doctor observed that Overman had a normal gait; his knee

range of motion was normal; he had a negative Drawer sign (a physical test for ACL tear); and

he had a negative McMurray test (test for meniscus tear).  Dr. Wang did not detect any swelling

or redness.  Because it was Overman's second injury, the doctor ordered X rays of the right knee.

The radiologist reported finding "[n]o acute fracture or malalignment" with "[s]mall knee joint

effusion."[6]  Wang Decl. Ex. B. 20, ECF No. 30-3.

On May 16, 2016, Overman came to see Dr. Wang, complaining that his knee sleeve was

not helping and that he wanted an MRI.  He told the doctor that he was regularly playing

---

[3]  This summary of the evidence, stated in the light most favorable to Overman, is taken from Overman's verified, amended complaint, the declaration of Dr. Wang and attached medical records, and Overman's verified submissions and his exhibits, offered in response to defendants' motions (ECF Nos. 16, 30, 36, 40, 59, 60, and 61).

[4]  At Green Rock, nurses are on duty 24 hours a day.  When an inmate requests medical attention, a nurse will assess him, determine whether he needs to be seen by a physician, and if so, arrange an appointment for him. Wang Decl. ¶ 5, ECF No. 30-1.

[5]  Overman alleges that on February 23, 2016. he also asked Dr. Wang for an MRI, but the doctor denied his request.

[6]  In this context, effusion refers to fluid around the knee joint.  See Wang Decl. ¶ 12, ECF No. 30-1.

basketball. Dr. Wang measured both knees at "36 cms. in circumference," repeated the tests for ACL and meniscus tear, and reported that both tests were negative. Wang Decl. ¶ 10, ECF No. 30-1. The doctor also noted that he "performed valgus stress test and varus stress test," to test for injuries of the medial and lateral ligaments, and these tests were also negative. Id. Dr. Wang told Overman that although his knee examination was normal, he should avoid sports. The doctor states that he saw no indication for an MRI based on the normal physical examination of the knee, but he ordered some Ibuprofen for pain.

On September 2, 2016, Overman requested an Ace Wrap to use for sports, and a nurse referred him to see Dr. Wang. Overman told the doctor that he was lifting weights, playing volleyball, and playing basketball. The doctor renewed the order for Ibuprofen and gave him an Ace Wrap, telling him to wear it "for exercise, basketball, volleyball, [or] weight lifting." Pl.'s Resp. 5, ECF No. 40.

Overman states his belief that on September 24, 2016, while playing basketball, he "tore a ligament in his right knee."[7] Id. at 4. Overman reported to the nurses that his "knee popped out" while playing basketball and it was painful for him to walk, so the nurses issued him crutches to use. Pl.'s Resp. Ex. 6, ECF No. 40-1. Dr. Wang ordered an X ray, which was performed the next day. The X ray results indicated some effusion around the knee.

Dr. Wang examined Overman's knee on October 5, 2016. At that time, the doctor noted some slight swelling of the knee on physical examination and gave Overman an order for a bottom bunk for one month. Based on the inmate's continuing complaints of knee pain, the doctor also made a request for approval for an MRI. Overman alleges that he used the crutches

---

[7] In the amended complaint, Overman alleges that the major ligament tear occurred on August 24, 2016, and his knee was x-rayed the next day. Am. Compl. 4, ECF No. 36-1. Because other sworn pleadings and the medical records indicate that the X ray occurred on September 25, 2016, however, I will assume that the August dates in the amended complaint are inadvertent error.

for eleven days and then turned them in "so as not to show weakness in prison." Pl.'s Aff. 6, ECF No. 59. Overman limped for months after this incident, id., and refrained from sports as Dr. Wang had previously recommended. Pl.'s Resp. 5, ECF No. 40.

As a matter of Virginia Department of Corrections ("VDOC") policy, all MRI tests must be approved by Dr. Ammonette, a VDOC administrator. The MRI request form stated that Overman, a "25 year old male with recurrent right knee pain for 10 months," who "is active playing basketball," had "request[ed] MRI of Right Knee." Wang Decl. Ex. B, at 8, ECF No. 30-4. As pertinent physical findings, the form listed "mild effusion, ROM normal, negative McMurray test, Negative Valgus Varus stress test," and also reported prior treatment: "NSAID, Knee brace, X-Ray small knee effusions." Id. Overman, who was on crutches at the time of the October 5, 2016, visit with Dr. Wang, denies that his range of motion was normal. He explains that when Dr. Wang told him to extend his right leg, he "tried to, but [he] could not." Overman Aff. 1, ECF No. 61. He also contends that the only other examination Dr. Wang performed that day was to measure both knees "to see how swollen [the] right knee was." Id. at 2.

Dr. Ammonette refused the MRI request. Instead, he recommended alternative treatment with conservative measures to include possibly anti-inflammatories, steroids, and sports restrictions. See Wang Decl. Ex. B, at 8, ECF No. 30-4.

Dr. Wang saw Overman in March 2017 for a medication review. At that time, Overman stated that he wanted to continue with a bottom bunk because of his knee pain. The doctor did not renew the bottom bunk order, however, because Overman appeared to him "to be fully ambulatory and had no apparent symptoms in his knee." Wang Decl. ¶ 17, ECF No. 30-1.

On April 26, 2017, a nurse noted in Overman's record his complaint that he had torn a ligament in his knee six months previously and that he had heard the knee pop earlier that day

while sitting cross-legged on his bed.  Pl.'s Resp. Ex. 8, ECF No. 40-1.  The nurse also wrote

Overman's claim that his knee pain and limping had worsened.  When Dr. Wang met with

Overman about this complaint on May 8, 2017, the inmate said again that he wanted an MRI of

his right knee.  He claimed that if he did not get one, he would file a lawsuit.  On examination,

the doctor noted no "crepitus" and that both knees were the same diameter.  Wang Decl. ¶ 18,

ECF No. 30-1.  He observed that Overman's knee range of motion was normal, that he "had a

negative Drawer sign (a physical test for ACL tear) and negative McMurray test (test for

meniscus tear)."  Id.  The doctor observed no swelling or redness.  Based on these findings, Dr.

Wang advised Overman that there was no indication for an MRI at that time.

On May 19, 2017, Overman reported that his right knee had popped again and caused

him to fall in the shower.  The medical records on that date noted "no redness, swelling, or break

in skin noted to [right] knee," but the inmate reported pain when putting weight on that leg.

Wang Decl. Ex. B, at 7-8, ECF No. 30-5.  Overman's request for crutches or a knee brace was

denied because of his segregation status.  He was treated with pain medication for five days and

advised to rest and ice the knee.

Dr. Wang's last examination of Overman was on June 7, 2017.  As a segregation inmate,

Overman was in shackles during the exam.  Nevertheless, Dr. Wang observed that he got on and

off the examination table without difficulty.  When Overman asked for renewal of his bottom

bunk pass, the doctor denied it.

Overman was transferred to Nottoway Correctional Center ("Nottoway") on July 26,

2017.  A doctor there first examined Overman for knee pain in early August of 2017.  The

doctor's notes reported a normal knee examination, and only conservative treatment was given at

that time.  On August 14, 2017, Overman complained that his knee had popped in the morning

and he was having difficulty walking down steps. He was referred to an outside orthopedic surgeon and was seen on September 5, 2017. An MRI was ordered on September 22, 2017, with Ammonette's approval. Ultimately, the surgeon diagnosed Overman with a "[c]hronic appearing complete tear of the ACL" and a "[c]omplex tear of the medial meniscus." Wang Decl. Ex. B, at 2, ECF No. 30-4. The medical notes about this consultation stated "ACL will not heal on its own. Will need ACL reconstruction" surgery. Id. at 6.

Dr. Wang states, "Although Mr. Overman was ultimately diagnosed with torn ligaments in his right knee, his physical examination and activity [were] not consistent with that diagnosis while he was under my care. Because he remained active in sports it is impossible to know exactly when the tears occurred prior to the MRI of September 22, 2017." Wang Decl. ¶ 23, ECF No. 30-1.

### B. Urinary Issues

In 2014, Overman was referred to a urologist after he complained of "urination almost every hour" for two years. Pl.'s Resp. Ex. 14, ECF No. 40-1. On August 7, 2014, a urologist diagnosed Overman with an enlarged prostate and placed him on Flo-Max (Hytrin). The specialist also recommended a follow up exam in six months and assignment to a single cell. Overman states that a single cell would allow him to "urinate more easily, because [he has] a shy bladder." Pl.'s Resp. 6, ECF No. 40.

While Overman was at Green Rock, Dr. Wang also evaluated and treated him for urinary issues. During an exam on September 8, 2015, Dr. Wang wrote that Overman had "benign prostate hypertrophy" and continued him on Hytrin. Wang Decl. ¶ 24, ECF No. 30-1. Overman asked if he needed a follow up with the urologist. The doctor saw no reason for such an appointment because the prison medical staff "could give [Overman] the medication and perform

the same prostate test (PS") that was performed by the urologist."[8]  Wang Decl. ¶ 24, ECF No.
30-1.

Overman says that he asked again on December 4, 2015, about a follow up exam by the
urologist "because of persistant urinary problems."  Pl.'s Resp. 6, ECF No. 40.  It is not clear
from the record that the nurses notified Dr. Wang of these complaints.  See Wang Decl. Ex. B, at
18, ECF No. 30-5.

On January 13, 2016, Overman reported to the nurses that he was having cloudy urine,
and they referred him to see the doctor.  At the exam on January 28, 2016, Overman reported
that he was experiencing "a pain in [his] right side lower intestines while urinating," which Dr.
Wang noted as "groin pain."  Pl.'s Resp. 6, ECF No. 40.  The doctor ordered "PSA" and urine
tests.  Wang Decl. ¶ 26. ECF No. 30-1.  The PSA was reported on February 2, 2016, as .0.4,
within the normal range of 0.0 to 4, and the urinalysis was also normal, with no elevation of
white blood cells or other sign of infection.  With these results, Dr. Wang saw no basis for
additional treatment at that time other than continuing the Hytrin medication.  Wang Decl. Ex. B,
at 19, ECF No. 30-5.

On February 23, 2016, Dr. Wang counseled Overman about the favorable result of his
PSA test and urinalysis.  The doctor told Overman that there was no need for a referral to a
urologist and refilled his Hytrin for six months.  For more than a year thereafter, Dr. Wang
continued to refill Overman's prescriptions for Hytrin and his other medications.  Dr. Wang
states that during this period, Overman "made no specific mention of further problem[s] with his
prostate or urine."  Id. at ¶ 27.

---

[8]  Overman complains that Green Rock could not provide the same tests that the urologist performed,
because the prison does not have an ultrasound machine to check the size of his prostate.  Pl.'s Resp 6, ECF No. 40.

Overman claims that he saw Dr. Wang again about urinary issues in November or December of 2016, but neither party has provided records of this exam. Overman alleges that he complained about the lower right-sided pain while urinating and asked to see the urologist, but the doctor said, "No urologist." Pl.'s Resp. 7, ECF No. 40.

On May 8, 2017, while Dr. Wang was seeing Overman about his knee complaints, Overman mentioned that he wanted to see a urologist for his cloudy urine. He also complained of right-sided, lower abdominal pain while urinating. The doctor ordered another urinalysis and an X ray to rule out a kidney stone. Overman refused the X ray and failed to appear for his scheduled urinalysis on May 11, 2017. Overman explains that he refused the X ray because he thought it was for his knee, and he wanted an MRI instead. He also states that as a segregation inmate in May 2017, he was unable to report to the medical unit for tests unless staff arranged for officers to escort him there, which did not happen.

During Dr. Wang's last visit with Overman on June 7, 2017, the inmate mentioned that he still wanted to see a urologist. Since Overman had no specific symptoms and had failed to follow through on prior testing Dr. Wang had ordered, the doctor did not re-order the tests and saw no reason to refer him to urologist.

At some point after Overman's transfer to Nottoway, Dr. Dixon requested approval to refer him to a urologist for consultation about his prostate issues. Dr. Ammonette did not approve this referral and instead, recommended prescribing Overman a different medication. Second Am. Compl. 2, ECF No. 60-1. Overman states that since his 2015 diagnosis with an enlarged prostate, his unspecified urinary symptoms have "worsened" and he has complained numerous times about experiencing pain in his lower intestines while urinating.

8

Liberally construed, Overman's § 1983 claims allege that (1) the defendants were deliberately indifferent to the risk that he had suffered injuries to ligaments in his right knee; and (2) the defendants were deliberately indifferent to Overman's serious medical needs for a single cell assignment and/or a follow up examination, as recommended by the urologist in 2014.

Dr. Wang has responded to Overman's amended complaint with a motion to dismiss and his declaration, supported with medical records. Dr. Ammonette has also filed a motion to dismiss. Overman has responded to both defendants' motions, making them ripe for disposition. In addition, Overman has filed a motion for preliminary injunctive relief against Dr. Ammonette.[9]

## II.

Both Dr. Wang and Dr. Ammonette have filed motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. In so doing, Dr. Wang has submitted his declaration and supporting medical records, on which Dr. Ammonette has relied in his arguments for dismissal.

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Fed. R. Civ. P. 12(d). Accordingly, I consider both defendants' motions under the summary judgment standard.[10]

---

[9] Overman initially filed his motion for interlocutory injunctive relief against Dr. Wang and Dr. Ammonette as a separate civil action in the United States District Court for the Eastern District of Virginia. When that court transferred the case to the Western District, the then-presiding judge had the clerk file that motion in this case and dismissed the new civil action without prejudice. See Overman v. Wang, No. 7:18CV00003 (W.D. Va. Jan. 3, 2018). Overman now admits that Dr. Wang, who practices in the Western District, cannot be ordered to provide the desired medical measures for Overman at Nottoway, which is located in the Eastern District of Virginia.

[10] The court warned Overman that the motions to dismiss might be construed and addressed as motions for summary judgment and advised him of his opportunity to respond with his own affidavits or other documents contradicting the defendants' evidence or otherwise explaining his claims. Overman has submitted verified responses and exhibits in response to the motions, making them ripe for decision.

Summary judgment is proper only where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 568 (4th Cir. 2015). [11] The moving party has the initial burden to show "the absence of an essential element of the nonmoving party's case and that it is entitled to judgment as a matter of law." Honor v. Booz–Allen & Hamilton, Inc., 383 F.3d 180, 185 (4th Cir. 2004). If so, then to survive summary judgment, "the nonmoving party then must recite specific facts showing that there is a genuine dispute of fact which merits a trial." Id. Summary judgment "will be granted unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented." Id.

On summary judgment, the court must consider the facts, and inferences to be drawn from those facts, in the light most favorable to the nonmoving party. Jacobs, 780 F.3d at 568. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The Eighth Amendment guarantees prisoners freedom from cruel and unusual punishment. U.S. Const. amend. VIII, § 3. As such,

> [a] prisoner has a constitutional right to the medical care necessary to address his serious medical needs. See Estelle v. Gamble, 429 U.S. 97, 103-04 (1976). And a prison official's "deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." See Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014). The necessary showing of deliberate indifference can be manifested by prison officials in responding to a prisoner's medical needs in various ways, including intentionally denying or delaying medical care, or intentionally interfering with prescribed medical care.

---

[11] I have omitted citations, internal quotation marks and alterations here and elsewhere in this opinion, unless otherwise noted.

> See Estelle, 429 U.S. at 104-05. Importantly, a judicial assessment of deliberate indifference has two aspects—an objective inquiry and a subjective inquiry. See Jackson, 775 F.3d at 178.
>
> To satisfy the objective inquiry of a deliberate indifference claim, "the inmate's medical condition must be serious—one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." See Jackson, 775 F.3d at 178 (internal quotation marks omitted). A medical condition is shown as objectively serious when it "would result in further significant injury or unnecessary and wanton infliction of pain if not treated." See Gayton v. McCoy, 593 F.3d 610, 620 (7th Cir. 2010). To satisfy the subjective inquiry of a deliberate indifference claim, the plaintiff must show that the public official "knows of and disregards an excessive risk to inmate safety or health." See Farmer v. Brennan, 511 U.S. 825, 837 (1994). A deliberate indifference claim must satisfy a high bar, and that bar is not met by showing that "an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." See Jackson, 775 F.3d at 178.

Formica v. Aylor, No. 16-7418, 2018 WL 3120790, at *7-8 (4th Cir. June 25, 2018)

(unpublished).

Dr. Wang does not dispute that Overman's claims concern serious medical conditions—torn ligaments and torn cartilage in his knee and an enlarged prostate. Likewise, I conclude that Overman has presented genuine issues of material fact concerning the seriousness of the medical conditions at issue throughout his course of treatment by the defendants. His evidence is that he suffered one or more traumatic knee injuries while in Dr. Wang's care, that his knee pain and difficulty walking worsened during the doctor's course of treatment, and that his injuries ultimately proved to be painful and debilitating ones that, according to the specialist's notes, will not heal by themselves. Similarly, Overman's enlarged prostate satisfies the objective component of the analysis. A doctor had diagnosed Overman with an enlarged, but noncancerous prostate that was adversely affecting urination and ordered medication. Records of this diagnosis put Overman's future treating physicians on notice to monitor and adjust treatment for this potentially serious condition as symptoms warranted.

11

Having thus resolved the objective inquiry in favor of Overman on summary judgment, I

now turn to the subjective inquiry of the deliberate indifference analysis—whether the

defendants "knew of and disregarded the excessive risk[s]" to their patient's health. Formica,

2018 WL 3120790, at \*9.

> That inquiry is a factual one "subject to demonstration in the usual ways,
> including inference from circumstantial evidence." See Farmer, 511 U.S. at 842.
> A factfinder is entitled, in appropriate circumstances, to "conclude that a prison
> official knew of a substantial risk from the very fact that the risk was obvious."
> Id. Indeed, jail officials "may not simply bury their heads in the sand and thereby
> skirt liability" by, for example, refusing to "verify underlying facts that [they]
> strongly suspected to be true, or . . . declin[ing] to confirm inferences of risk that
> [they] strongly suspected to exist." See Makdessi v. Fields, 789 F.3d 126, 133-34
> (4th Cir. 2015) (internal quotation marks omitted). As the Supreme Court has
> recognized, when a medical professional of a jail facility knows of a serious
> medical need, the Eighth Amendment requires reasonable action. See Farmer,
> 511 U.S. at 844.

Id. On the other hand, the deliberate indifference standard "is not satisfied by . . . mere

disagreement concerning [q]uestions of medical judgment," Germain v. Shearin, 531 F. App'x

392, 395 (4th Cir. 2013) (internal quotation marks and citations omitted), or mere negligence in

diagnosis or treatment. Estelle, 429 U.S. at 105-06.

> In other words, any negligence or malpractice on the part of the doctors in
> missing the diagnosis does not, by itself, support an inference of deliberate
> indifference by the doctors to [plaintiff's] medical needs. To avoid summary
> judgment, [plaintiff] need[s] to produce evidence that the doctors actually drew
> the inference between the symptoms [and the condition causing them].

Johnson v. Quinones, 145 F.3d 164, 166 (4th Cir. 1998) (affirming summary judgment for

doctors who failed to diagnose plaintiff's symptoms as evidence of pituitary tumor, but consulted

experts and provided treatment consistent with their alternative diagnoses that later proved

erroneous).

Undisputed records reflect that Dr. Wang was Overman's treating physician at Green

Rock and had ready access to his medical records and history. Such records indicate that the

nursing staff assessed Overman's complaints and scheduled Dr. Wang to examine him numerous times between spring 2015 and June 2017. Dr. Ammonette had no regular, personal contact with Overman and merely reviewed the treating physicians' requests proposing diagnostic tools for the inmate in October 2016 (MRI) and fall 2017 (MRI and urology consultation). Although Dr. Ammonette did not approve two of these diagnostic proposals, in both cases, he recommended alternative treatment. Clearly, none of the doctors ignored or failed to provide any treatment in response to Overman's medical concerns and conditions. As stated, the question is whether either of the defendants "knew of and disregarded the excessive risk to [Overman's] health" that his knee condition or his enlarged prostate posed at some time during the relevant period. Formica, 2018 WL 3120790, at *9.

I conclude that the evidence, taken in the light most favorable to Overman, presents genuine issues of disputed material fact. Overman may persuade a fact finder that both doctors knew while he was at Green Rock that he had likely torn ligaments and/or cartilage in his right knee. Yet, they delayed his access to an MRI or similar testing capable of confirming such damage and providing direction for effective treatment and prevention of further injury.

Overman's testimony and the medical records indicate that he complained about his knee popping and hurting as early as April 2015. He made complaints that the popping recurred, with worsening pain, in August and December 2015, and in February, May, and early September 2016. An X ray in May 2016 showed fluid buildup in the knee, although no fracture. Dr. Wang recommended that Overman avoid sports, but without making an alternative diagnosis for his knee problems that would be alleviated by the treatment provided. Moreover, he refused Overman's requests for an MRI or similar test, to confirm whether the inmate had a torn

ligament and/or cartilage that placed him at risk of greater injury if he continued his sports activities without more aggressive joint protection or surgical repair.

After Overman reinjured his knee in September and came on crutches to see Dr. Wang, the doctor finally notified Dr. Ammonette of Overman's request for an MRI. But Dr. Ammonette denied the request, despite Overman's documented medical history of his knee "popping" and worsening pain and disability. Overman's evidence that he did not resume participating in sports hereafter supports a reasonable inference that the ligament and cartilage damage must have occurred by September 24, 2016. Neither Dr. Ammonette nor Dr. Wang, however, offers an alternative diagnosis after that date that would have been effectively addressed by the conservative measures provided to Overman over the ensuing months at Green Rock. The defendants also do not explain why Dr. Dixon, merely a few weeks after Overman's transfer to Nottoway, so readily recognized the likelihood of ligament damage from highly similar symptoms and complaints.

On this evidence, I find that Overman might persuade a reasonable fact finder that both doctors "declined to confirm inferences of risk that [they] strongly suspected to exist" by failing to request or approve an MRI earlier in the course of treatment they provided him.[12] Makdessi, 789 F.3d at 133-34. Accordingly, I will deny summary judgment for both defendants in their individual capacities as to Overman's claim (a).[13]

---

[12] I find that the unreported decisions the defendants have cited concerning treatment of inmates' ACL injuries are factually distinguishable from Overman's case and have no bearing on my decision. See Smith-Bey v. Petterson, Civil Action No. JKB-15-1921, 2016 WL 2866850 (D. Md. May 16, 2016); Carter v. Ulep, No. 1:13cv1425, 2015 WL 539562 (E.D. Va. Feb. 6, 2015); Shepherd v. Blocker, Civil Action No. 1:13-13757, 2015 WL 106371 (S.D.W. Va. Jan. 7, 2015). The court warned Overman that summary judgment might be granted for the defendants if he did not respond to the motion to dismiss by filing affidavits or other documents contradicting the doctor's evidence or otherwise explaining his claims. Overman has submitted verified responses and exhibits to the motions, making them ripe for the court's consideration.

[13] These factual disputes also defeat defendants' argument for summary judgment on the ground of qualified immunity. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (holding that

I reach the opposite conclusion regarding Overman's claims about his urinary and prostate issues. These claims fault Dr. Wang for failing to follow the urologist's written recommendations from August 2014 for medication, a follow up examination, and (without explanation from the urologist) a single cell assignment. As Overman's treating physician from August 2015 to June 2017, however, Dr. Wang could rightfully base treatment decisions during that period on his physical examinations and the inmate's current symptoms, complaints, and test results. Dr. Wang continued to provide Overman with medication to address the urination problems related to his enlarged prostate. In response to Overman's reported abdominal pain while urinating and cloudy urine in January 2016, Dr. Wang ordered tests and based treatment decisions on their results, which were normal.

Then, it is undisputed that nearly a year passed before Overman talked to Dr. Wang again about any urinary complaint. Overman claims that in November or December 2016, he told Dr. Wang that he was having similar pain with urination again, but Dr. Wang did not change his treatment or send him to an urologist. Another five or six months passed when Overman did not seek a doctor's care for his urinary issues.

When Overman complained again in May 2017 about cloudy urine and abdominal pain with urination, Dr. Wang ordered an X ray to test for kidney stones and a urinalysis to test for infection. Overman chose to refuse the X ray and offers no evidence that his failure to undergo the scheduled urinalysis was, in any way, Dr. Wang's fault. Overman presents no evidence that he described any particular urinary symptoms during his last visit with Dr. Wang in June 2017.

---

summary judgment is appropriate only where no material facts are genuinely disputed and the evidence as a whole could not lead a rational fact finder to rule for the nonmoving party); Buonocore v. Harris, 65 F.3d 347, 359 (4th Cir. 1995) (holding that when resolution of qualified immunity question and the case itself both depend upon determination of what actually happened, summary judgment on grounds of qualified immunity is not proper).

I note, however, that Overman cannot prevail on any claim for monetary damages against defendants in their official capacities. See Will v. Michigan Dep't of State Police, 491 U.S. 58 (1989). Thus, I will grant summary judgment for defendants as to all such claims.

He also fails to show that Dr. Wang knew of any medical necessity for a single cell assignment related to his complaints of pain during urination and/or cloudy urine.

On this evidence, I find no disputed issue of material fact that could persuade a reasonable fact finder that Dr. Wang knew at any time of prostate or urinary issues requiring different treatment or testing than he provided or attempted to provide to Overman. Overman's evidence presents nothing more than his disagreement with Dr. Wang about whether a urology consultation or single cell was medically necessary. Such disagreements do not implicate the Eighth Amendment. Germain, 531 F. App'x at 395. Therefore, I grant summary judgment for Dr. Wang on claim (b).

I also cannot find that Overman states any Eighth Amendment claim against Dr. Ammonette related to his treatment for urinary symptoms. Overman's allegations against this defendant are conclusory at best:

> I have complained multiple times [at Green Rock] about pains in my lower intestines while urinating but still to no avail.
> After I transferred to Nottoway Prison in July of 2017, I went to Dr. Dixon with my problems, and he finally recommended me to go to the urologist. This time, though, it was Dr. Ammonette who denied it.

Second Am. Compl. 1-2, ECF No. 60-1. Overman complains that Dr. Ammonette recommended trying a new medication instead. See id. at 2, ECF No. 60. Such a mere disagreement between patient and doctor over particular medical treatment or its timing fails to rise to constitutional proportions. Germain, 531 F. App'x at 395. Therefore, I will summarily dismiss this claim without prejudice under 28 U.S.C. § 1915A(b)(1).[14]

---

[14] Under § 1915A(b)(1), a district court may summarily dismiss any portion of a prisoner's complaint that "fails to state a claim upon which relief may be granted."

## III.

As a final matter, I must decide Overman's motion for interlocutory injunctive relief regarding his future medical care. Specifically, Overman seeks an order directing the VDOC to: arrange for him to have "immediate knee surgery" and physical therapy at an outside facility (not Nottoway); to assign him to a single cell as recommended by the urologist; and to arrange a follow up visit for him with a urologist. Mot. Prelim. Inj. Ex. 2, ECF No. 45-1. After review of the record, I conclude that Overman's motion must be denied.

The party seeking a preliminary injunction must make a clear showing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). Such interlocutory injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Id. at 22.

As an initial matter, Dr. Ammonette is simply not the right official to provide the relief Overman wants. It is clear from the pleadings that Dr. Ammonette is an administrator who approves or disapproves requested treatments or referrals. There is no evidence that he is personally involved in assessing an inmate's day-to-day symptoms or making arrangements for outside specialist referrals, surgeries, or particular cell assignments. Rather, Overman's medical treatment team at Nottoway bears responsibility for such decisions and actions. Those individuals are outside the jurisdiction of this court and are not parties to this case.

More importantly, Overman has not met the evidentiary requirements under Winter for the extraordinary relief he has requested. First, as to his urinary claims, he has not demonstrated a likelihood of success on the merits. Thus, his request for immediate injunctive relief for this

17

problem fails at the outset on this necessary element. Second, Overman has not provided evidence that any of the requested interventions for his knee condition is medically necessary at the present time to prevent him from suffering imminent, irreparable harm at Nottoway. He has not alleged that anyone there is denying him treatment, such as pain medication and protective devices for his knee, or that the treatment being provided is inadequate. He presents no evidence that the damage to his knee or his pain will objectively worsen without immediate therapy by an outside expert or surgery. Third, Overman's interests in the aggressive, requested interventions for his knee injury do not win a balancing test against the interests of the VDOC in avoiding the costs of such procedures until medically necessary according to the treating physician's professional judgment, rather than the patient's mere preference. Finally, because Overman fails to make the required showing on other facets of the Winter analysis, it is in the public interest to leave the administration of state prison health care systems to state prison administrators. For these reasons, I will deny his motion for interlocutory injunctive relief.

## IV.

For the stated reasons, I deny defendants' motions as to Overman's claim against them in their individual capacities for his knee injury, but their motions are granted as to all claims for monetary damages asserted against them in their official capacities. Dr. Wang's motion to dismiss as to Overman's urinary problems is granted. I also summarily dismiss under 28 U.S.C. § 1915A(b)(1) the claim against Dr. Ammonette regarding Overman's urinary problems for failing to state a claim. Finally, I deny the motion for interlocutory injunctive relief, and set the remaining claim for a bench trial.

The Clerk is directed to send copies of this memorandum opinion and the accompanying

order to Overman and to counsel of record for the defendants.

Enter:  September 21, 2018

*/s/ Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge